UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ROY ELIJAH SKILES, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | No. 1:22-cv-01073-JMS-MKK |
| | ) | |
| ELIAS REBOLLAR, | ) | |
| | ) | |
| *Defendant*. | ) | |

**ORDER**

*Pro se* Plaintiff Roy Elijah Skiles filed this lawsuit on May 24, 2022, asserting various claims under federal and state law for events arising from a June 28, 2020 encounter he had with Defendant Elias Rebollar, a then Westfield Police Department ("WPD") police officer, that resulted in a mental-health detention and other ensuing legal circumstances. Officer Rebollar has filed a Motion for Summary Judgment on all claims. [Filing No. 58.] The Motion is now ripe for the Court's consideration.

**I.**
**PROCEDURAL HISTORY**

Mr. Skiles filed this lawsuit on May 24, 2022, setting forth claims for various constitutional violations including the Second Amendment, Fourth Amendment, Fifth Amendment, Eighth Amendment, Thirteenth Amendment, violation of 34 U.S.C. § 12601;[1] and state law violations

---

[1] In his Complaint, Mr. Skiles also asserts a violation of 18 U.S.C. § 371, a statute criminalizing conspiracies against the United States. [Filing No. 1 at 2.] After Officer Rebollar argued that "[a]s an individual, [Mr. Skiles] has no right to enforce criminal law," [Filing No. 78 at 28], Mr. Skiles replied, "[d]ue to my ignorance of law, conspiracy can be retracted," [Filing No. 76 at 3]. The Court therefore considers the conspiracy claim to be voluntarily dismissed by Mr. Skiles.

1

under Indiana Code § 34-13-3-3.[2]  [Filing No. 1 at 2.]  Mr. Skiles initially named four Defendants, including Hamilton County, WPD, WPD's Internal Affairs Department, and Officer Rebollar.  [Filing No. 1; *see also* Filing No. 30 at 4.]  WPD and WPD's Internal Affairs Department filed a Motion to Dismiss based on immunity, [Filing No. 20], which the Court granted in a September 12, 2022 Order.  [Filing No. 30.]

On October 6, 2022, Mr. Skiles filed an Amended Complaint.  [*See* Filing No. 32.]  The Court struck the Amended Complaint in an October 18, 2022 Order for failure to follow the procedures outlined in the Court's Amended Scheduling Order.  [Filing No. 33 at 2.]  The Court's October 18, 2022 Order explained that if Mr. Skiles "wish[ed] to file an Amended Complaint, he must file a motion for leave to file an amended complaint by **November 14, 2022**, as explained in the Amended Scheduling Order."  [Filing No. 33 at 2 (citing Filing No. 29 at 2-3).]  The Court further explained that "[a]ny such motion must include the proposed amended complaint as an attachment, explain how the proposed amended complaint differs from the original complaint, and explain why an amendment is needed."  [Filing No. 33 at 2.]  The Court also reminded Mr. Skiles

---

[2] In the list of statutes that Mr. Skiles alleges Officer Rebollar violated, Mr. Skiles listed both "IC 34-13-3-3 line 14" and "IC 34-3-3 line 21, Police misconduct."  [Filing No. 1 at 2.]  Indiana Code § 34-13-3-3 is part of Indiana's Tort Claims Act, and is titled, "Immunity of governmental entity or employee."  Indiana Code § 34-3-3 is a repealed evidence Chapter relating to blood tests.  In his Motion for Summary Judgment, Officer Rebollar refers to both claims as stemming from Indiana Code § 34-13-3-3, thus assuming that Mr. Skiles meant to rewrite "IC 34-13-3-3" instead of "IC 34-3-3."  [Filing No. 78 at 30-31.]  In his response, Mr. Skiles does not challenge Officer Rebollar's classification that both his state law claims reference the Indiana Tort Claims Act.  [*See* Filing No. 76.]  Accordingly, the Court surmises that Mr. Skiles meant to reference "IC 34-13-3-3" instead of "IC 34-3-3."  In any event, Indiana Code § 34-3-3 was repealed in 1978, *see* 1978 Ind. Acts 1286, § 57(7), and Mr. Skiles has waived any argument as to Indiana Code § 34-3-3 due to failure to develop it.  *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

that "he must comply with all Court Orders, including the Amended Scheduling Order." [Filing No. 33 at 2.]

Despite being advised that he could file another Amended Complaint if done properly, Mr. Skiles did not file an Amended Complaint by the November 14, 2022 deadline or thereafter.

On February 21, 2023, Defendant Hamilton County was dismissed by stipulation, [Filing No. 46], leaving Officer Rebollar as the sole Defendant. Officer Rebollar has moved for summary judgment on all of Mr. Skiles' claims. [Filing No. 58.]

## II.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). "'Summary judgment is not a time to be coy.'" *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)). Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

3

"[S]peculation may not be used to manufacture a genuine issue of fact." *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021). Rather, each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e). And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.* The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When the evidence includes a videotape of the relevant events, the Court does not adopt the non-moving party's version of the events when that version is blatantly contradicted by the videotape. *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) (citing *Scott v. Harris*, 550 U.S. 372, 379-80 (2007)).

## III.
### STATEMENT OF FACTS

At the outset, the Court notes that Mr. Skiles testified to the circumstances regarding the events that follow, but parts of his testimony are blatantly contradicted by the officers' body worn camera footage ("Bodycam Footage").  Accordingly, the Court relies on the Bodycam Footage. *See Williams*, 809 F.3d at 942; *Scott*, 550 U.S. at 379-80.

Moreover, the Court notes that Mr. Skiles failed to comply with the rules for summary judgment filings by not citing to any admissible evidence to support his assertions as required by the Federal Rules of Civil Procedure and this Court's Local Rules.  [*See* Filing No. 76; Fed. R. Civ. Pro. 56(c); S.D. Ind. L.R. 56-1(e).] Compliance with the rules is required even for *pro se* litigants. *See McCarthy v. Perdue*, 768 F. App'x 550, 552 (7th Cir. 2019) ("[T]he judge properly required compliance with the rules for summary-judgment filings, even from a *pro se* litigant" when the *pro se* litigant did not cite to evidence in the record to support his version of the facts.) (emphasis added); *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008). (*Pro se* litigants "are not excused from compliance with procedural rules.").  It is well settled that the Court may strictly enforce summary judgment rules. *McCurry v Kenco Logistics Servs., LLC*, 942 F.3d 783, 787 (7th Cir. 2019); *McCarthy*, 768 F. App'x at 552.

Mr. Skiles was explicitly advised of his obligations with respect to his summary judgment response.  [*See* Filing No. 67.]  Officer Rebollar provided the notice required by Local Rule 56-1(k) when a party seeks summary judgment against a *pro se* litigant, which contains verbatim text of both Federal Rule of Civil Procedural 56 and Local Rule 56-1.  [Filing No. 67 at 2-5.]   Still, Mr. Skiles did not comply.  [*See generally* Filing No. 76.]

Pursuant to the standard detailed above and the circumstances the Court has noted, the Court finds the following to be the undisputed facts, supported by admissible evidence in the record.

### A.  The 911 Call

On June 28, 2020, Melody Skiles, Mr. Skiles' then wife, called 911 and reported that she was concerned for Mr. Skiles and explained that she had recently filed for divorce and that Mr. Skiles was "pulling his gun out and tapping it on the table and tapping it on his head" and also cocking the gun.  [Filing No. 58-6; 911 Call at 00:01-00:29; 911 Call at 03:11.][3]  Mrs. Skiles informed the 911 operator that she and their two minor daughters were also home.  [911 Call at 04:52.]

### B.  Police Officers Arrive

WPD officers, including Officer Rebollar, were dispatched to the Skiles' home.  [Filing No. 58-2 at 1; *see also* Filing No. 58-6.]  The 911 operator remained on the phone with Mrs. Skiles until the officers arrived at the house.  [911 Call at 12:23-12:35.]  Once the officers arrived, they told dispatch to instruct Mrs. Skiles to exit the house with her daughters.  [911 Call at 9:00-9:04.]  Once Mrs. Skiles and her daughters were outside, Officer Rebollar, followed by two more officers, went inside the house.  [Rebollar Bodycam Footage at 3:36; Mitchell Bodycam Footage at 5:03-5:25; Filing No. 58-2 at 2.]

---

[3] Officer Rebollar manually filed several audio and video recordings, *see* Filing No. 59, including: the 911 call made by Mrs. Skiles; his Bodycam Footage; Officer Tyler Mitchell's Bodycam Footage; Officer Berns' Bodycam Footage; Officer Mitchell's Bodycam Footage from the time period in which he transported Mr. Skiles to the hospital; the phone call that Mr. Skiles made to dispatch to retrieve his guns; Officer Leanne Carter's Bodycam Footage; and Officer Nick Bonds' Bodycam Footage.  The Court cites to these, respectively, as: "911 Call"; "Rebollar Bodycam Footage"; "Mitchell Bodycam Footage"; "Berns Bodycam Footage"; "Mitchell Bodycam Transport Footage"; "Mr. Skiles' Gun Retrieval Call"; "Officer Carter Bodycam Footage"; and "Officer Bonds Bodycam Footage."

Mr. Skiles was sitting on the couch in the living room immediately to the right upon entry to the house.  [Rebollar Bodycam Footage at 3:38.]  Officer Rebollar quickly located Mr. Skiles, and stated, "hey, what's up man?"  [Rebollar Bodycam Footage at 3:38.]  Mr. Skiles stated that he was "watching TV."  [Rebollar Bodycam Footage at 3:41.]  Officer Rebollar then asked to see Mr. Skiles' hands and instructed him not to touch anything.  [Rebollar Bodycam Footage at 3:41; Filing No. 58-2 at 2.]  Mr. Skiles immediately raised both hands in the air, but then immediately lowered his right hand to grab a handgun that was in his lap.  [Rebollar Bodycam Footage at 3:42-3:46.]  Mr. Skiles held up the handgun by bottom of the handle with his fingertips.  [Rebollar Bodycam Footage at 3:43-3:45.]  Officer Rebollar reiterated that Mr. Skiles' hands should be in the air.  [Rebollar Bodycam Footage 3:44-3:46.]  Mr. Skiles immediately put the gun in his lap, grabbed the remote with his right hand, turned down the TV, and asked, "why are you guys in my house?"  [Rebollar Bodycam Footage 3:46-3:49.]  Officer Rebollar responded, "because your wife invited us."  [Rebollar Bodycam Footage at 3:49-3:51.]

Mr. Skiles put the remote down, turned his baseball hat backward, and told the officers that he did not want them there.  [Rebollar Bodycam Footage 3:49-3:55.]  Officer Rebollar again told Mr. Skiles to keep his hands in the air.  [Rebollar Bodycam Footage 3:52-3:53.]  Mr. Skiles again immediately complied, but then dropped both hands, and grabbed his gun again with his right hand.  [Rebollar Bodycam Footage at 3:53-3:56.]  This time, Mr. Skiles properly held the gun by its handle, had his finger "over the trigger block," and kept it close to his lap with the barrel of the

gun pointed in the direction of the officers.[4]  [Rebollar Bodycam Footage at 3:56-4:02; Filing No. 58-2 at 6; *see also* Mitchell Bodycam Footage at 5:17-5:20; Filing No. 58-3 at 2; Filing No. 58-1 at 80 ("I put my hand over the - - not actually touching the trigger, but over the trigger block, I guess you would call it.").]

Officer Mitchell instructed Mr. Skiles to put his hands up, and Officer Rebollar told Mr. Skiles to "put that [the gun] down." [Rebollar Bodycam Footage at 3:59-4:00].  Officer Rebollar and Officer Mitchell drew their weapons in a "low ready" position, and Officer Rebollar backed away.  [Rebollar Bodycam Footage at 3:59-4:05; Filing No. 58-3 at 2; *see also* Filing No. 58-2 at 2.][5]  Officer Rebollar again told Mr. Skiles to please put the gun down.  [Rebollar Bodycam Footage at 4:09-4:10.]  Mr. Skiles told the officers, while still holding the gun in his lap, that he did not want the officers in his house.  [Rebollar Bodycam Footage at 4:11-4:14.]  Officer Rebollar said that he would talk to Mr. Skiles alone outside if he would put the gun down.  [Rebollar Bodycam Footage at 4:15-4:30.]  Mr. Skiles responded that they could talk in the kitchen and then put the gun in a backpack that was sitting right next to him on the couch.  [Rebollar Bodycam Footage at 4:30-4:31.]  Officer Rebollar later described this part of the encounter, which lasted around 30 seconds, [Rebollar Bodycam Footage at 3:56-4:30], as "very tense," and that "[t]he

---

[4] Mr. Skiles disputes that he had the gun pointed the direction of the officers.  [Filing No. 76 at 5.] The Court does not adopt Mr. Skiles' version of this fact because it is blatantly contradicted by Officer Rebollar's Bodycam Footage, [Rebollar Bodycam Footage at 3:56-4:02].  *See Williams,* 809 F.3d at 942; *Scott,* 550 U.S. 379-80.  The Bodycam Footage shows that Mr. Skiles picked up the gun for the second time, held it properly by the handle, with his finger over the trigger block, kept it low in his lap, and had it pointed away from him and toward Officers Rebollar and Mitchell. [Rebollar Bodycam Footage at 3:56-4:02.]

[5] Officer Rebollar's weapon suddenly appears in the bottom right view of his Bodycam Footage. [Rebollar Bodycam Footage at 3:59-4:05.]

possibility that deadly force would be necessary to prevent [Mr.] Skiles from shooting an officer crossed [his] mind." [Filing No. 58-2 at 2.]

### C.  Mr. Skiles and Officer Rebollar Go to the Kitchen to Talk

While preparing to stand up, Mr. Skiles told the officers not to panic, that he had another gun right next to him that he was going to put in the backpack, that he just wanted the officers "to know" that it was there, and that both guns were licensed and registered under his name. [Rebollar Bodycam Footage at 5:04-5:19.]  Mr. Skiles stood up, grabbed his backpack, and headed to the kitchen table. [Rebollar Bodycam Footage at 5:23-5:46.]  Officer Rebollar followed him, and they both sat at the kitchen table to talk. [Rebollar Bodycam Footage at 5:40-6:00.]

Mr. Skiles explained that he "got divorce papers on Father's Day" and was just sitting in their house about to clean his gun because he had previously been out shooting.  [Rebollar Bodycam Footage at 6:03-6:39.]  Mr. Skiles stated that his wife had been gone for three days and had just come back. [Rebollar Bodycam Footage at 7:13-7:25.]  He also explained that earlier that day, he asked Mrs. Skiles why she was leaving and why they could not just talk it out.  [Rebollar Bodycam Footage 7:26-7:43.]  He said that Mrs. Skiles would not go to marriage counseling with him and that he told her that he would be getting out of the house in the next week.  [Rebollar Bodycam Footage at 8:05-8:16.]  Mr. Skiles said he then asked Mrs. Skiles, "you really just don't care?" [Rebollar Bodycam Footage at 8:16-8:18; *see also* Rebollar Bodycam Footage at 14:37-14:44 (explaining again what had happened prior to the officers' arrival).]  He said Mrs. Skiles responded, "nope," and started walking up the stairs. [Rebollar Bodycam Footage 8:18-8:21; *see also* Rebollar Bodycam Footage at 14:39-14:44.]  Mr. Skiles then said, "and then next thing I know, you guys [the officers] are pulling up." [Rebollar Bodycam Footage at 8:21-8:25.]  A few minutes later, Mr. Skiles stated that he usually does not smoke his vape in the house because of

the kids, but that after that conversation with Mrs. Skiles, he was "shaky and edgy," and began to smoke his vape.  [Rebollar Bodycam Footage at 14:49-15:00.]

Officer Rebollar asked if Mr. Skiles knew of a reason why Mrs. Skiles called the police, and Mr. Skiles responded, "Um, well I know why.  She's been recording.  She is going to do everything she can to fight me because the kids would rather come live with me."  [Rebollar Bodycam Footage at 9:46-10:06.] Mr. Skiles then began to share information regarding his mental and physical health, stating, "I am trying to get her [Mrs. Skiles] to listen because I just discovered that, you know, I'm not insane. You know, I have been seeing things since I was a little kid pop out of my head, and found out that I have, not until I was 39, I had narcolepsy and cataplexy."[6] [Rebollar Bodycam Footage at 10:27-10:42.]  He shared the struggles that he and his wife had been facing in their relationship and that he had been laid off from his two jobs, going from "six figures to zero," and had "no money left."  [Rebollar Bodycam Footage at 10:45-12:23.]

Mr. Skiles then shared that his doctor recently "put [him] on new meds" due to severe anxiety and mentioned that he has panic attacks when he is away from his family because a relative was molested by a member of Mrs. Skiles' family and that after a five-year fight, the perpetrator was finally in prison.  [Rebollar Bodycam Footage at 13:17-13:49.]  Mr. Skiles further explained that his doctor told him that he had never seen brain waves like Mr. Skiles' before and that he was prescribed medication for it.  [Rebollar Bodycam Footage 13:56-14:18.]  Officer Rebollar stated that he saw prescription medication bottles on the couch next to Mr. Skiles and asked what Mr. Skiles was taking the medication for.  [Rebollar Bodycam Footage at 5:07-15:12.]  Mr. Skiles shared that he takes prescription medication for narcolepsy, cataplexy, depression, and anxiety,

---

[6] Cataplexy is a symptom of narcolepsy.  It involves sudden and brief muscle weakness while awake and is triggered by strong emotions, like laughter.  *Cataplexy*, Cleveland Clinic (Nov. 06, 2023), https://my.clevelandclinic.org/health/symptoms/cataplexy.

and that while he was on the couch before the officers showed up, he "just took everything [he] was supposed to take, just to make sure and try to settle down before [he] got up, started cleaning [his] guns and just trying to do something to relax [his] mind." [Rebollar Bodycam Footage 15:15-15:28.] Officer Rebollar asked Mr. Skiles how much medication he takes, to which he responded that he takes Adderall in a certain amount and a cataplexy drug to help keep his emotions even, and stated, "not to spill it out to you guys, but I tried killing my father at the age of 7 because he beat my mother, and I always thought my head was messed up because of that.  No, my head wasn't messed up because of that.  My head actually has issues I found out last year." [Rebollar Bodycam Footage at 16:35-17:07.]  He continued and explained that he also takes a blood pressure medication, a pain patch due to a car accident that resulted in a spine injury, and "once and a while" at night he takes a Vicodin if his back is tensing up and cannot sleep.  [Rebollar Bodycam Footage at 17:07-17:54.]  Officer Rebollar made a comment about how Mr. Skiles was taking a lot of medication, and Mr. Skiles followed it up by stating that he "finally got [his] head cleared" and "was doing great" despite everything else.  [Rebollar Bodycam Footage at 18:11-18:50.]

Mr. Skiles then shared that the divorce papers blindsided him and admitted that he "lost [his] mind for a minute" after receiving them.  [Rebollar Bodycam Footage at 18:50-19:12.]  Mr. Skiles explained that some text messages that he sent to his wife after receiving the divorce papers "may seem a little psychotic but when you're blindsided, you're mentally unstable for a minute anyway," but that he never threatened his wife or kids or hurt any of them.  [Rebollar Bodycam Footage at 19:27-19:44.]

Officer Rebollar then asked if Mr. Skiles had a support line or the ability to contact his doctors if needed.  [Rebollar Bodycam Footage at 20:01-20:09.]  Mr. Skiles said that he did not

need any of that, was doing fine until he received the divorce papers, and has been surviving well enough.  [Rebollar Bodycam Footage at 20:09-21:35.]

### D.  Officer Rebollar Confers with Other Officers

Office Rebollar ended his conversation with Mr. Skiles and went to confer with the other officers who had talked to Mrs. Skiles.  [Rebollar Bodycam Footage at 23:46-24:08; Filing No. 58-2 at 3.]  The officers that spoke with Mrs. Skiles summarized their conversation to Officer Rebollar, stating that Mrs. Skiles confirmed that she had been gone, and when she came back that day, Mr. Skiles said, "you're not divorcing me" and tapped the gun on the table and pointed it at his head during their argument.  [Rebollar Bodycam Footage 24:03-24:41.]  Officer Rebollar then summarized his conversation with Mr. Skiles, focusing on what Mr. Skiles shared regarding his mental and physical health history while also acknowledging that Mr. Skiles was refuting any statement that he wanted to hurt himself or anyone else.  [Rebollar Bodycam Footage at 24:58-26:29.]  After summing up the conversation, Officer Rebollar stated that he was leaning toward getting Mr. Skiles medical help.  [Rebollar Bodycam Footage 26:29-26:47.]  One of the other officers then stated that Mrs. Skiles told the officers that he never pointed the gun at her or their daughters, only at his head.  [Rebollar Bodycam Footage 26:47-26:50.]

### E.  The Officers Talk to Mrs. Skiles To Get More Details

The officers then went outside to talk to Mrs. Skiles to "get more specifics" and ask for more details.  [Rebollar Bodycam Footage 27:15-27:49.]  Mrs. Skiles stated that Mr. Skiles pulled the gun out of his pocket and that he was hitting himself on the head with the top of the gun and tapping it on the kitchen table.  [Rebollar Bodycam Footage at 28:10-28:13; *see* Rebollar Bodycam Footage at 30:44-31:13.]

### F.  Officer Rebollar Confers Again with the Other Officers

Officer Rebollar conferred with another officer who had been outside with Mrs. Skiles and her daughters and explained that he was considering an immediate detention for Mr. Skiles because he was showing signs of drug usage, including that he was shaky and that his eyes had a glazed look, "like a 100-mile stare," and because of his mental health history and the recent traumatic events that Mr. Skiles was experiencing.  [Rebollar Bodycam Footage at 28:35-30:40.]  Based on the information gathered, the officers were concerned that Mr. Skiles might be a danger to himself.  [Rebollar Bodycam Footage at 30:40-33:46.]  The officers also asked Mrs. Skiles if his appearance (glazed eyes and shakiness) were normal for him, and she said it was not normal but that it had started around when she filed for divorce.  [Rebollar Bodycam Footage at 39:40-46.]  She shared that at times, he was reasonable about the divorce and then other times he stated that he would not allow it to happen.  [Rebollar Bodycam Footage 42:15-4:23.]

Officer Rebollar determined that it was not safe to leave Mr. Skiles at home and that they would be taking him to a hospital.  [Rebollar Bodycam Footage 46:35-47:10.]  Officer Rebollar went back into the house and spoke with Officer Mitchell, who stated that Mr. Skiles had been making "off the chart" remarks about how a relative had been molested and that he put a gun to the perpetrator's head and said he was going to murder the whole family and eat Cheerios with blood in them.  [Rebollar Bodycam Footage at 48:00-48:31.]  Officer Mitchell then stated that he thought it would be best to immediately detain Mr. Skiles, and Officer Rebollar explained that that is what they had determined.  [Rebollar Bodycam Footage at 48:45-49:25.]

### G.  The Officers Inform Mr. Skiles of the Immediate Detention Plan

The officers went to tell Mr. Skiles what was going to happen.  [Rebollar Bodycam Footage at 54:05-54:28.]  Mr. Skiles said that he would go see a mental health professional if the officers

13

wanted him to, but that he did not need to speak with one.  [Rebollar Bodycam Footage 55:30-55:50.]  Later in the discussion, Mr. Skiles said that he would not go to the hospital.  [Rebollar Bodycam Footage at 1:03:56-1:04:49.]  He then said that if the evaluation would only last a couple of hours, then he would go, but that he would not stay overnight.  [Rebollar Bodycam Footage at 1:05:40-1:05:50.]  The officers eventually asked Mr. Skiles to stand up, and he asked for two minutes to smoke his vape and calm down before going with the officers.  [Rebollar Bodycam Footage at 1:07:53-1:08:05.]  Officer Rebollar agreed.  [Rebollar Bodycam Footage at 1:08:06.]

### H. Mr. Skiles Decides What to Take with Him and Chooses to Have WPD Hold His Guns for Safekeeping

Mr. Skiles asked what he could take with him.  [Rebollar Bodycam Footage at 1:09:30.] Officer Rebollar informed him of the options regarding his firearms because he could not take them.  [Rebollar Bodycam Footage at 1:09:44-1:10:06.]  The options included having the officers take them for safe keeping, leaving them at the house to get later, or having a friend or family member come get them.  [Rebollar Bodycam Footage at 1:09:44-1:10:06.]  Mr. Skiles chose to have the officers take the guns for safekeeping.  [Rebollar Bodycam Footage at 1:11:52-1:12:03; *see also* Filing No. 58-1 at 106 ("I requested them [the officers] to take them [the guns.]").]

### I. Mr. Skiles Walks to the Police Car

The officers escorted Mr. Skiles to the police car; Mr. Skiles walked unassisted and slightly in front of the officers.[7]  [Rebollar Bodycam Footage at 1:12:27-1:14:40.]  Upon arrival to the police car, an officer handcuffed Mr. Skiles, using two handcuffs linked together to provide more width between his arms because of the size of his shoulders.  [Rebollar Bodycam Footage 1:14:46-1:15:00.]  Mr. Skiles slid into the backseat of the police car, and Officer Rebollar fastened the seatbelt.  [Rebollar Bodycam Footage 1:16:13-1:17:12.]

### J. Officer Mitchell Transports Mr. Skiles to the Hospital

Officer Mitchell transported Mr. Skiles to the hospital.  [Mitchell Bodycam Transport Footage at 00:00-35:46.]  Before beginning the transport, Officer Mitchell asked Mr. Skiles if he was comfortable in the backseat.  [Mitchell Bodycam Transport Footage at 00:32-00:40; Mitchell Bodycam Transport Footage at 1:50-1:53.]  Mr. Skiles responded that he was fine and appreciated "the hospitality."  [Mitchell Bodycam Transport Footage at 1:54-1:58.]  During the drive, Mr. Skiles talked about multiple subjects including a planned trip to Michigan, his volunteer work, and how the detention would affect his divorce.  [Mitchell Bodycam Transport Footage at 2:00-32:08.]  Mr. Skiles stated that "this is so embarrassing," [Mitchell Bodycam Transport Footage at 31:41],

---

[7] Mr. Skiles testified that while being escorted to the police car, his toenails were ripped off and he thought he was on the ground at one point.  [Filing No. 58-1 at 109; Filing No. 58-1 at 113-114.]  The Court does not adopt Mr. Skiles' version of his escort to the extent that such version is blatantly contradicted by the officers' Bodycam Footage.  The Bodycam Footage shows that Mr. Skiles walked to the police car on his own, was handcuffed, sat in the car, was buckled in, and remained there during his transport to the hospital by Officer Mitchell.  [Berns Bodycam Footage at 1:08:20-1:25:20; Rebollar Bodycam Footage at 1:12:27-1:21:20; Mitchell Bodycam Footage at 1:14:00-1:25:10; Mitchell Bodycam Transport Footage 0:00-35:46.]  Additionally, Mr. Skiles failed to put forth or cite to any evidence to support his assertions of force as required under the summary judgment rules.  Fed. R. Civ. P. 56(c); S.D. Ind. L.R. 56-1(e).  The Court therefore does not credit Mr. Skiles' version of the escort.  Fed. R. Civ. P. 56(e)(2).

but did not complain about physical pain during the transport, [*see* Mitchell Bodycam Transport Footage at 00:00-35:46; Filing No. 58-3 at 5].

### K.  Officer Mitchell and Mr. Skiles Arrive at the Hospital's Behavioral Health Unit

When they arrived at Community North Hospital, Officer Mitchell went inside to advise staff that they had arrived and that he was waiting for the immediate detention paperwork. [Mitchell Bodycam Transport Footage at 32:10-33:34.]  He went back to the car and told Mr. Skiles that another patient would be admitted before him.  [Mitchell Bodycam Transport Footage at 34:02-34:33.]  Mr. Skiles then told Officer Mitchell that he was getting too hot in the backseat, and Officer Mitchell turned on the air conditioning.  [Mitchell Bodycam Transport Footage 34:40-34:55.]  A hospital police officer approached the car and spoke briefly with Officer Mitchell. [Mitchell Bodycam Transport Footage 35:26-35:46.]  The officers got Mr. Skiles out of the car and walked him into the behavioral health unit of the hospital.[8]  [Filing No. 58-3 at 5.]  Officer Mitchell went back to his car to wait for an email from Officer Rebollar with a completed Immediate Detention Form.  [Filing No. 58-3 at 5.]  Once he received it, he went back inside the hospital, provided it to the staff, and left.  [Filing No. 58-3 at 5.]  In the Immediate Detention Form, Officer Rebollar summarized what had happened, including stating that "[Mr. Skiles] at one point lifted the barrel of the handgun towards police."  [Filing No. 58-2 at 11.]

---

[8] Mr. Skiles contends that a nurse who brought him in "completed notes stating that [he] arrived bloody and [his] wrist and arms were black."  [Filing No. 76 at 2.]  Mr. Skiles does not cite to any evidence to support this assertion.  [*See generally* Filing No. 76.]  Therefore, the Court does not credit the assertion.  *See* Fed. R. Civ. P. 56.  Mr. Skiles also acknowledges that Officer Rebollar—the only Defendant—did not handcuff him.  [Filing No. 58-1 at 154.]  Further, Officer Rebollar asserts that had Mr. Skiles been injured, the behavioral health staff at the hospital would have required Officer Mitchell to take him to the emergency room for treatment before accepting him. [Filing No. 58-3 at 5.]  Mr. Skiles fails to address this assertion by Officer Rebollar, so the Court considers it undisputed.  *See* Fed. R. Civ. P. 56(e).

**L.  Mr. Skiles Is Transferred to Another Hospital and Discharged Two Days Later**

At some point after arriving at Community North Hospital, Mr. Skiles was transferred to Community East Hospital.[9]  [Filing No. 58-1 at 146; *see* Filing No. 58-2 at 5.]  Lesley R. Eaton, LMFT,[10] signed Community Health Network's Application for Emergency Detention of Mentally Ill Person.  [Filing No. 58-16.]  Mr. Skiles was discharged on June 30, 2020, two days later.  [Filing No. 58-1 at 152; Filing No. 58-16.]

**M. Later Events—None of Which Involve Officer Rebollar**

On June 29, 2020, WPD Officer Eric Grimes completed an affidavit for search warrant for seizure and retention of firearms.  [Filing No. 58-18.]  Officer Grimes relied on Officers Rebollar's and Mitchell's case narratives of the June 28, 2020 incident to set out the facts, but he made his own probable cause determination for the firearm seizure based on the narratives.  [Filing No. 58-18.]  Officer Rebollar did not know that a firearms seizure proceeding would be initiated.  [Filing No. 58-2 at 7.]

On June 30, 2020, Mrs. Skiles called 911 after Mr. Skiles went to their house to pick up one of their daughters.  [Filing No. 58-8.]  Officer Rebollar did not respond to this call.  [Filing No. 58-8 at 1; Filing No. 58-2 at 7.]

---

[9] Mr. Skiles testified that he thinks Officer Mitchell forced him to be transferred to Community East Hospital, [Filing No. 58-1 at 146-148], but also admitted that "there is no evidence that he forced that," [Filing No. 58-1 at 148], and that the paramedics and the security guard at Community North Hospital told him he was being transferred because they did not have enough room at Community North Hospital.  [Filing No. 58-1 at 152; *see also* Filing No. 58-1 at 146.]  In any event, Officer Mitchell is not a Defendant in this lawsuit.

[10] "LMFT" stands for "Licensed Marriage and Family Therapist."  *MFT Licensing Boards*, American Association for Marriage and Family Therapy, https://www.aamft.org/Directories/MFT_Licensing_Boards.aspx (last visited Nov. 20, 2023).

On July 2, 2020, Mr. Skiles called dispatch from the WPD lobby to retrieve his guns.  [Mr. Skiles' Gun Retrieval Call.]  Officers Rebollar, Carter, and Bonds were dispatched to speak with him.  [Filing No. 58-9 at 1.]  But by the time Officer Rebollar had arrived, the other officers had spoken to Mr. Skiles, and he had left.[11]  [Filing No. 58-2 at 7.]

On July 3, 2020, Mr. Skiles was served with a protective order that Mrs. Skiles had obtained, and one of his daughters was removed from his custody.  [Filing No. 58-11 at 4.]  Officer Rebollar was not dispatched to this incident and was not present.  [Filing No. 58-2 at 7-8; *see also* Filing No. 1 at 168-169.]

On July 5, 2020, Mr. Skiles had an encounter with WPD officers near his house while trying to retrieve clothes.  [Filing No. 58-1 at 191.]  Officer Rebollar was not involved.  [Filing No. 58-1 at 192-193.]

On July 16, 2020, a WPD officer investigated an alleged harassment incident reported by Mrs. Skiles.  [Filing No. 58-15.]  The officer filed an affidavit for probable cause, and Mr. Skiles was charged with the criminal offense of invasion of privacy.  [Filing No. 58-15 at 14-15.]  Officer Rebollar was not involved in the investigation or charges.  [Filing No. 58-2 at 8.]

**N.  Mr. Skiles Submits a Complaint to WPD**

On July 19, 2021, Mr. Skiles submitted a complaint to WPD alleging that the information in the Immediate Detention Form was not consistent with the events captured by the Bodycam Footage and that he was "set up" by Officer Rebollar and other WPD officers because Mrs. Skiles and Officer Rebollar were neighbors or acquaintances.  [Filing No. 58-4 at 4.]  He alleged that Officer Rebollar left employment with WPD for the Carmel Police Department ("CPD"), and that

---

[11] Mr. Skiles testified that he thought he saw Officer Rebollar, but Officer Carter's and Officer Bonds' Bodycam Footage do not show Officer Rebollar present.  [Carter Bodycam Footage; Bond Bodycam Footage.]

together, these events "show a conspiracy, cover-up, and harassment against him by WPD."

[Filing No. 58-4 at 4.]

WPD Lt. Brodie Houston investigated the allegations and found them to be unfounded.

[Filing No. 58-4 at 1-3; Filing No. 58-4 at 6.]

### O.  Officer Rebollar Did Not Know Mrs. Skiles Prior to the June 28, 2020 Events

Prior to his June 28, 2020 dispatch to the Skiles' home, Officer Rebollar did not know Mrs. Skiles and had never met her.  [Filing No. 58-2 at 8.]  He likewise did not know and had never met Mr. Skiles prior to that day.  [Filing No. 58-2 at 8.]  Officer Rebollar did not detain Mr. Skiles to benefit Mrs. Skiles in divorce or custody proceedings[12]—he detained Mr. Skiles for mental health treatment because he determined that Mr. Skiles met the statutory criteria based on what Mrs. Skiles had reported, his interactions and observations with Mr. Skiles, and the information from other responding officers.  [Filing No. 58-2 at 8.]

---

[12] According to Mr. Skiles, the chain of events that led to the June 28, 2020 encounter with WPD began with the prosecution of a William Zimmerman for molesting Mr. Skiles' relative in Brown County, Indiana.  [Filing No. 58-1 at 34.]  William Zimmerman's son, Tim Zimmerman, is married to Mrs. Skiles' sister and is a City of Carmel firefighter.  [Filing No. 58-1 at 37-38.]  After five years' effort by Mr. Skiles, William Zimmerman was prosecuted and sentenced to prison.  [Filing No. 58-1 at 35.]  After that, Mrs. Skiles' family pushed her toward divorce to get revenge for sending William Zimmerman to prison.  [Filing No. 58-1 at 37.]  Mr. Skiles theorizes that Mrs. Skiles lied about him tapping the gun on his head to obtain an advantage in the divorce and to get custody of their children.  [Filing No. 58-1 at 53; Filing No. 58-1 at 68.]  Mr. Skiles contends that Mrs. Skiles has "police friends."  [Filing No. 58-1 at 204.]  Mr. Skiles also believes that Officer Rebollar knows Tim Zimmerman and that they lived in the same neighborhood before and after Officer Rebollar's divorce.  [Filing No. 58-1 at 38.]  Despite his speculation and hints that he would produce evidence of a connection or ulterior motive behind the June 28, 2020 events, Mr. Skiles has not put forth any admissible evidence of a connection between Officer Rebollar and Mrs. Skiles or of a hidden motive and fails to support his assertion of such with evidence already in the record.  [See Filing No. 58-1 at 46-47; see generally Filing No. 76.]  The Court therefore does not credit Mr. Skiles' assertions.  See Fed. R. Civ. P. 56(e)(2); Weaver, 3 F.4th at 934 ("[i]t is well-settled that speculation may not be used to manufacture a genuine issue of fact.").

### P.  Officer Rebollar Becomes a Police Officer for the City of Carmel, Indiana

Officer Rebollar left WPD and became a police officer with the City of Carmel in September 2020.  [Filing No. 58-2 at 1.]  By the time that Officer Rebollar responded to the Skiles' house on June 28, 2020, he had completed most of the hiring process for CPD and was scheduled for an interview.  [Filing No. 58-2 at 9.]  Officer Rebollar's decision to seek and accept employment with CPD was unrelated to the events involving Mr. Skiles.  [Filing No. 58-2 at 9.]

**IV.**
**DISCUSSION**

The Court first addresses Mr. Skiles' constitutional claims,[13] followed by his federal statutory claim, and his state law claims.

### A.  Constitutional Claims

Mr. Skiles brings his constitutional claims via 42 U.S.C. § 1983, a statute that provides a remedy to constitutional violations.  To succeed, Mr. Skiles must establish that Officer Rebollar violated a right secured by the Constitution.  *See* 42 U.S.C. § 1983; *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1043 (7th Cir. 2023) ("In broad terms, § 1983 authorizes suits against state government officials who violate an individual's federal rights.").  Under § 1983, a government employee "is only liable for his or her own misconduct."  *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021) (citation omitted).  In other words, Officer Rebollar can only be liable "if he caused or personally participated in a constitutional deprivation."  *Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 824 (7th Cir. 2022) (citation omitted).

---

[13] At times, the Court found it difficult to discern under which constitutional amendments Mr. Skiles' is alleging his claims and which of his arguments correspond with which alleged constitutional violations.  The Court has done its best to interpret Mr. Skiles' claims and arguments.

In his Complaint and Objection to Motion for Summary Judgment, Mr. Skiles alleges that several individuals, entities, and events violated various constitutional rights.  [Filing No. 1 at 5; *see also* Filing No. 76.]   However, not all of the allegations are relevant to the matter before the Court.  Officer Rebollar is the only Defendant in this case, so the Court focuses only on allegations that involve Officer Rebollar.  Further, the Court is constrained by § 1983's doctrine of personal participation.  *See Milchtein*, 42 F.4th at 824.  Since Officer Rebollar cannot be liable for others' misconduct, *id.*, the Court focuses only on actions that Officer Rebollar took.

With respect to Officer Rebollar, Mr. Skiles alleges that:

> Starting on June 28, 2020, [Officer Rebollar][14] had started to infringe[] on many civil rights, civil liberties, amendments, Indiana codes, and more of [Mr. Skiles'].  By Officer Rebollar falsifying documentation, with the intent to harm, causing a snowball effect on [Mr. Skiles].  Excessive force and police misconduct to take Plaintif[f]s,[15] & separate them for 6 months.

[Filing No. 1 at 5.]

### 1.  Fourth Amendment

Mr. Skiles asserts Fourth Amendment claims based on a lack of probable cause for his detention, Officer Rebollar making false statements in the Immediate Detention Form, and the use of excessive force while detaining him.  The Court addresses each theory in turn.

---

[14] Because Officer Rebollar is the only Defendant left in the case, the Court replaces Mr. Skiles' original language referring to multiple defendants with Officer Rebollar.

[15] It appears that Mr. Skiles uses "Plaintiffs" to refer to himself and his daughters.  [See Filing No. 1 at 3; Filing No. 25 at 2.]  However, because Mr. Skiles lists only himself as a Plaintiff in the caption of the Complaint, [Filing No. 1 at 1], the Court concludes that he is the only Plaintiff in this action.  In any event, because Mr. Skiles is proceeding *pro se*, he cannot bring a lawsuit on behalf of any other person.  *See Georgakis v. Illinois State Univ.*, 722 F.3d 1075, 1077 (7th Cir. 2013) ("A nonlawyer can't handle a case on behalf of anyone except himself.")

a.  <u>Probable Cause</u>

Officer Rebollar argues in support of his Motion for Summary Judgment that there is no Fourth Amendment violation because there was probable cause for the immediate detention. [<u>Filing No. 78 at 19-22</u>.]  He also argues that he is entitled to qualified immunity.  [<u>Filing No. 78 at 29</u>.]

In response, Mr. Skiles argues that there was no probable cause.  [<u>Filing No. 76 at 2</u>.]  He also argues that:

> it was based on false accusations from [Mrs.] Skiles who is currently being investigated by [WPD] on harassment and false accusations caught on bodycam footage.  Other statements used for the detention were from many items from my past.  Per the first councilor that spoke with me when first detained at Community North, she found no issues. . . . This is a true violation of my Fourth Amendment Right where immunity does not protect [Officer Rebollar].

[<u>Filing No. 76 at 2</u>.]  Mr. Skiles attaches a document that contains a timeline of events alleging the same.  [*See* <u>Filing No. 76 at 5-10</u>.]

In his reply, Officer Rebollar reiterates his argument that there was probable cause for the detention as shown by the totality of circumstances, including information from Mrs. Skiles and his observations of Mr. Skiles' behavior during the June 28, 2020 encounter.  [<u>Filing No. 77 at 5-8</u>.]  He argues that Mr. Skiles' contention that Mrs. Skiles lied or is being investigated by WPD does not defeat summary judgment because probable cause is based on what the officers knew at the time of the detention, and there is no evidence that Officer Rebollar knew that Mrs. Skiles was lying when he determined that Mr. Skiles met the criteria for an immediate detention.  [<u>Filing No. 77 at 6</u>.]  Officer Rebollar also argues that it does not matter whether the hospital staff determined that Mr. Skiles was "fine."  [<u>Filing No. 77 at 7</u>.]  He contends that Mr. Skiles "was not detained because of his past as he suggests," but rather that "the manner in which he spoke about past events in the context of his current struggles with the divorce suggested an unstable mindset."  [<u>Filing</u>

No. 77 at 7.] He also contends that the Immediate Detention Form is irrelevant to the probable cause determination because it was written after probable cause had been determined and it was not falsified. [Filing No. 77 at 8-10.] He argues further that if the Court finds the Bodycam Footage inconclusive and accepts Mr. Skiles' contention that the gun was not pointed at the officers, there was still probable cause to detain. [Filing No. 77 at 7.]

The Fourth Amendment protects against unreasonable seizures. U.S. Const. amend. IV. A mental-health seizure is a seizure that is governed by the Fourth Amendment. *Bruce v. Guernsey*, 777 F.3d 872, 875 (7th Cir. 2015) (citing *Fitzgerald v. Santoro*, 707 F.3d 725, 732 (7th Cir. 2013)). "Like ordinary seizures, mental-health seizures comply with the Fourth Amendment if officers have probable cause, which exists 'only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard.'" *Bruce*, 707 F.3d at 875-86 (quoting *Villanova v. Abrams*, 972 F.2d 792, 795 (7th Cir. 1992)). The standard is whether the officers had probable cause to believe that the individual needed immediate hospitalization because he was a danger to himself or others, *Bruce*, 777 F.3d at 876, and is an objective standard judged by the totality of the circumstances, *see, e.g.*, *United States v. Alexander*, 78 F.4th 346, 348 (7th Cir. 2023). The constitutionality does not depend on the particularities of state law.[16] *Bruce*, 777 F.3d at 876. The key to constitutionality is whether the seizure was supported by probable cause, *id.*, which depends on what the officers knew before the seizure, not

---

[16] Indiana's law tracks the general standard though. Indiana Code § 12-26-5-0.5 provides: "A law enforcement officer, having reasonable grounds to believe that an individual has a mental illness, is either dangerous or gravely disabled, and is in immediate need of hospitalization and treatment, may do one (1) or more of the following: (1) Apprehend and transport the individual to the nearest appropriate facility. The individual may not be transported to a state institution. (2) Charge the individual with an offense, if applicable." The Court notes that a slightly different version of the statute was in effect at the time of the events in this case, but the standard remained the same. *Compare* Ind. Code § 12-26-4-1 (repealed effective July 1, 2023), *with* Ind. Code § 12-26-6-0.5.

what was known after the fact, *id.* at 878.  In determining probable cause, "a law enforcement officer may rely on information conveyed to him by another law enforcement officer or the agency for which he works." *Id.* at 876.

Officer Rebollar's mental-health seizure of Mr. Skiles complied with the Fourth Amendment.  Officer Rebollar had probable cause to believe that Mr. Skiles needed immediate hospitalization because he was a danger to himself or others.  Officer Rebollar's determination was based on a myriad of facts and observations, including: (1) Mrs. Skiles' report that Mr. Skiles was tapping the gun to his head, information on which Officer Rebollar could rely, *see Bruce*, 777 F.3d at 876; (2) Mr. Skiles' report that Mrs. Skiles had just told him that she did not care; (3) the approximately 30 seconds that Mr. Skiles properly held a handgun pointed in the direction of the officers while the officers repeatedly told him to put it down and put his hands in the air; (4) his observations that Mr. Skiles was shaky and had a blank, glazed stare, reminiscent of drug usage; (5) Mr. Skiles' disclosure of his own mental and physical health issues; (6) Mr. Skiles' disclosure of recent traumatic events including receiving divorce papers on Father's Day and losing his jobs; (7) Mr. Skiles' disclosure that he put a gun to the head of a man who molested a relative, threatened to kill him, and stated that he would eat Cheerios in blood; (8) Mr. Skiles' report that he tried to kill his father when he was 7 years old; and (9) Mrs. Skiles' report that Mr. Skiles' behavior was not normal.  Such facts amount to compelling evidence of danger in the eyes of a reasonable officer.  After all, probable cause has been found with less compelling evidence of danger.  *See, e.g., Bruce* 777 F.3d at 876-77 (affirming dismissal of Fourth Amendment claim against officers who, based on dispatcher's report that plaintiff was possibly suicidal, detained her until another officer arrived); *Fitzgerald*, 707 F.3d at 733 (affirming summary judgment for defendants where dispatcher told officers that the detainee was suicidal, and detainee appeared intoxicated and

admitted she was on antidepressants and going through a difficult period, but also told police at scene that she was not in fact suicidal); *Turner v. City of Champaign*, 979 F.3d 563, 567-68 (7th Cir. 2020) (affirming summary judgment for defendants where officers encountered a homeless man who appeared disoriented, did not respond coherently when asked what day of the week it was, and was jaywalking).

The Court understands that Mr. Skiles feels that he was not a danger to himself or others, but that is not the viewpoint from which the Court must make its determination.  From the required objective viewpoint, the totality of circumstances surrounding the June 28, 2020 encounter support a conclusion by a reasonable officer that Mr. Skiles was a danger to himself or others.

Mr. Skiles appears to argue that the fact that the counselor at the hospital "found no issues" means that the detention violated his rights or that he was not dangerous.  This argument fails.  It does not change the Court's analysis because any determination made at the hospital was made after the seizure and was not something that Officer Rebollar knew at the time.  *Bruce*, 777 F.3d at 878 (probable cause depends on what the officers knew before the seizure).  Mr. Skiles also argues that the detention was based on false statements by Mrs. Skiles, but this argument likewise has no impact on the Court's analysis.  It is immaterial whether Mrs. Skiles provided false statements regarding Mr. Skiles tapping the gun because probable cause is based on the facts and circumstances within Officer Rebollar's knowledge at the time of the event, *Bruce*, 777 F.3d at 878, and if Mrs. Skiles was lying, Officer Rebollar did not know that was the case.  [Filing No. 58-2 at 4 ("If [Mrs. Skiles] provided false information, I [Officer Rebollar] had no knowledge that the information was untrue.").]

In any event, Officer Rebollar is entitled to qualified immunity.  Qualified immunity is available when a defendant's conduct "does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Bruce*, 777 F.3d at 878.  "When the constitutionality of an action depends on the existence of probable cause, the officer must have had 'arguable probable cause' for qualified immunity to attach." *Bruce*, 777 F.3d at 878 (citation omitted).  "Thus, even when an officer lacks probable cause, he is still entitled to qualified immunity when a reasonable officer could have reasonably believed that probable cause existed in light of well-established law." *Id.* at 878-79 (quotations and citation omitted).  Arguable probable cause is "a relatively flexible standard." *Id.* at 879.  When determining whether arguable probable cause exits, the Court still takes "into consideration the particular circumstances facing the officer." *Id.*

Based on the facts and circumstances enumerated above as well as the cases where probable cause had been found on less compelling evidence, *Bruce* 777 F.3d at 876-77; *Fitzgerald*, 707 F.3d at 733; *Turner*, 979 F.3d at 567-68, Officer Rebollar had arguable probable cause to believe that Mr. Skiles was a danger to himself or others.  He therefore would be entitled to qualified immunity from Mr. Skiles' seizure claim.

In sum, Officer Rebollar acted with probable cause, and Mr. Skiles' claim against him for unlawful seizure fails as a matter of law.

### b.   False statement

Mr. Skiles alleges that Officer Rebollar's statement on the Immediate Detention Form that he lifted the gun towards the officers was falsified.  [Filing No. 1 at 5; Filing No. 76 at 5.]  The Court, however, has already determined that the Bodycam Footage shows that Mr. Skiles had the gun pointed in the direction of the officers; therefore, Officer Rebollar's statement was not false.  Because Officer Rebollar did not make a false statement in the Immediate Detention Form, Mr. Skiles' Fourth Amendment claim on this ground fails as a matter of law.

c.   Excessive Force

Mr. Skiles alleges that Officer Rebollar used excessive force.  [Filing No. 1 at 5; Filing No. 76 at 5.]  The Court, however, has already determined that Bodycam Footage blatantly contradicts Mr. Skiles' allegations that Officer Rebollar used any force.  Officer Rebollar's Bodycam Footage shows that Mr. Skiles walked unassisted and slightly in front of him on the way to the police car. [Rebollar Bodycam Footage at 1:12:27-1:14:40.]  Mr. Skiles was then handcuffed by a different officer, [Rebollar Bodycam Footage 1:14:46-1:15:00], and slid into the backseat of the police car where Officer Rebollar fastened the seatbelt.  [Rebollar Bodycam Footage 1:16:13-1:17:12.]  Mr. Skiles remained buckled in the back seat with the car door open until Officer Mitchell transported him to the hospital.  [Rebollar Bodycam Footage at 1:17:12-1:23:28; Berns Bodycam Footage at 1:08:20-1:25:20; Mitchell Bodycam Footage at 1:14:00-1:25:10; Mitchell Bodycam Transport Footage at 0:00-35:46.]  Because Officer Rebollar did not use excessive force, there is no Fourth Amendment violation on this ground.  Mr. Skiles' claim fails as a matter of law.

Officer Rebollar's Motion for Summary Judgment is **GRANTED** as to Mr. Skiles' Fourth Amendment claims.

*2.   Second Amendment*

Officer Rebollar argues that the Second Amendment is not applicable because Mr. Skiles voluntarily gave his guns to WPD for safekeeping and Officer Rebollar was not involved in the firearms seizure.  [Filing No. 78 at 26.]  He also argues that even if he is deemed to have personally participated in the firearms seizure, there is still no Second Amendment violation.  [Filing No. 78 at 26.]

Mr. Skiles responds in the timeline submitted with his response that:

Due to the false allegations by [Mrs. Skiles] and the false statement by Officer Rebollar, my guns were kept from me by [WPD].  Per [the case report], I asked

them to personally take my guns to [WPD] office and store them.  These guns were never seized from my home as I handed them over until I would be released from the detention center.  By taking my guns from me, based on Officer Rebollar's Immediate Detention Report, my Second Amendment Rights were violated by not allowing me to bear arms.

[Filing No. 76 at 5.]

Officer Rebollar reiterates that he was not involved after the immediate detention and therefore cannot be liable due to a lack of personal participation.  [Filing No. 77 at 11.]

The Second Amendment protects an individual's right to possess a firearm, but the right is not unlimited.  U.S. Const. amend. II; *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008); *United States v. Holden*, 70 F.4th 1015, 1017 (7th Cir. 2023) ("Governments may keep firearms out of the hands of dangerous people who are apt to misuse them.") (citation omitted).  The Court notes that Mr. Skiles voluntarily surrendered his firearms to WPD for safekeeping while he was detained, even though Officer Rebollar informed him that the firearms could remain at the house.  Mr. Skiles' choice does not implicate the Second Amendment because it was his choice to surrender his firearms, not the government's.

As for the later firearms seizure by WPD initiated on June 29, 2020, Officer Rebollar was not personally involved and therefore cannot be liable.  *Milchtein*, 42 F.4th at 824.  WPD Officer Eric Grimes initiated the firearms seizure.  [Filing No. 58-18.]  Officer Grimes referenced Officer Rebollar's and Officer Mitchell's case narratives of the June 28, 2020 incident, the accuracy of which Mr. Skiles does not dispute,[17] and then made his own probable cause determination regarding seizing the firearms.  [Filing No. 58-18.]  Because Officer Rebollar was not personally involved in this action, Mr. Skiles' claim fails as a matter of law.

---

[17] Mr. Skiles only takes issue with language in the Immediate Detention Form completed by Officer Rebollar.  [Filing No. 58-1 at 88; Filing No. 58-1 at 94; Filing No. 58-1 at 98.]

Officer Rebollar's Motion for Summary Judgment is **GRANTED** as to Mr. Skiles' Second Amendment claim.

### 3. Fifth Amendment

Officer Rebollar argues that the Fifth Amendment does not apply because it only applies to acts of the federal government, which he is not a part of.  [Filing No. 78 at 27.]

Mr. Skiles lists the Fifth Amendment as a violation, stating only that "[t]his entire event [the mental health detention] had no due process." [Filing No. 76 at 6.]

Officer Rebollar does not address Mr. Skiles' Fifth Amendment claim in his reply.  [*See* Filing No. 77.]

"The Fifth Amendment's due process clause applies only to acts of the federal government and does not limit actions of state officials." *Wrinkles v. Davis*, 311 F. Supp. 2d 735, 738 (N.D. Ind. 2004).  Officer Rebollar is a local, not federal, officer, so the Fifth Amendment does not apply, and Mr. Skiles' claim fails as a matter of law.

Officer Rebollar's Motion for Summary Judgment is **GRANTED** as to Mr. Skiles' Fifth Amendment claim.

### 4. Eighth Amendment

Officer Rebollar argues that the Eighth Amendment does not apply because Mr. Skiles was not convicted of a crime.  [Filing No. 78 at 27.]

Mr. Skiles lists the Eighth Amendment as a violation but provides no argument in support. [*See* Filing No. 76.]

Officer Rebollar does not address Mr. Skiles' Eighth Amendment claim in his reply.  [*See* Filing No. 77.]

The Eighth Amendment "applies only to convicted persons" and pretrial detainees.  *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010).  Mr. Skiles was not convicted of a crime, let alone held as a pretrial detainee.  Accordingly, the Eighth Amendment does not apply, and Mr. Skiles' claim fails as a matter of law.

In any event, Mr. Skiles made no argument regarding the Eighth Amendment.  This failure results in the waiver of any argument under the Eighth Amendment.  *See Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011) ("[I]t is not this court's responsibility to research and construct the parties' arguments.")  (cleaned up); *see also Schaefer*, 839 F.3d at 607 ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

Officer Rebollar's Motion for Summary Judgment is **GRANTED** as to Mr. Skiles' Eighth Amendment claim.

5. *Thirteenth Amendment*

Officer Rebollar argues that the Thirteenth Amendment is inapplicable.  [Filing No. 78 at 28.]

Mr. Skiles lists the Thirteenth Amendment as a violation but provides no argument in support of its application.  [*See* Filing No. 76.]

Officer Rebollar does not address Mr. Skiles' Thirteenth Amendment claim in his reply.  [*See* Filing No. 77.]

The Thirteenth Amendment provides: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XII.  The Thirteenth Amendment "does not provide a private right of action for damages." *John Roe I v. Bridgestone*

*Corp.*, 492 F. Supp. 2d 988, 997 (S.D. Ind. 2007).  Accordingly, Mr. Skiles' claim fails as a matter of law.

In any event, Mr. Skiles made no argument regarding the Thirteenth Amendment.  This failure results in the waiver of any argument under the Thirteenth Amendment.  *See Draper*, 664 F.3d at 1114; *Schaefer,* 839 F.3d at 607.

Officer Rebollar's Motion for Summary Judgment is **GRANTED** as to Mr. Skiles' Thirteenth Amendment claim.

### 6.  *Fourteenth Amendment*

Officer Rebollar argues that the Fourteenth Amendment is inapplicable.  [Filing No. 78 at 28.]

Mr. Skiles lists the Fourteenth Amendment as a violation, stating that "[t]his entire event [the mental health detention] had no due process."  [Filing No. 76 at 6.]  Right after that statement, Mr. Skiles lists that the following rights were violated: "right to parents one['s] child"; "Equal protection"; and "Right to Privacy."  [Filing No. 76 at 6.]

Officer Rebollar replies that he was not personally involved in events after the immediate detention.  [Filing No. 77 at 11.]

The Fourteenth Amendment's due process clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  The Fourteenth Amendment's due process clause does not apply when a constitutional claim is covered by a specific constitutional provision, like the Fourth Amendment.  *Hess v. Garcia*, 72 F.4th 753, 764-65 (7th Cir. 2023).  "When 'the Fourth Amendment provides an explicit textual source of constitutional protection against [a particular] sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process [under the

Fourteenth Amendment]," must be the guide for analyzing [the] claims.'" *Id.* at 764 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "Substantive due process may apply when, 'outside the context of a seizure, . . . a person [is] injured as a result of police misconduct.'" *Id.* at 765.

Here, the Fourth Amendment—not the Fourteenth Amendment—is the proper source for Mr. Skiles' claims against Officer Rebollar. Officer Rebollar was only personally involved in the seizure, and therefore can only be liable for his actions during the seizure. *Milchtein*, 42 F.4th at 824. Because the Fourth Amendment specifically governs seizures, that Amendment, instead of the Fourteenth Amendment, governs Mr. Skiles' claims with respect to Officer Rebollar. *Hess*, 72 F.4th at 764-65. Accordingly, the Fourteenth Amendment does not apply to Officer Rebollar's actions, and Mr. Skiles' claim fails as a matter of law.

Officer Rebollar's Motion for Summary Judgment is **GRANTED** as to Mr. Skiles' Fourteenth Amendment claim.

In sum, Mr. Skiles' constitutional claims all fail as a matter of law, and the Court **GRANTS** Officer Rebollar's Motion for Summary Judgment on those claims.

### B. Federal Statutory Claim

Mr. Skiles alleges that Officer Rebollar violated 34 U.S.C. § 12601, a statute authorizing the United States Attorney General to bring an action for equitable or declaratory relief against government officials responsible for juvenile justice or incarceration of juveniles. [Filing No. 1 at 2.]

Officer Rebollar argues that Mr. Skiles, as an individual, has no authority to enforce this law. [Filing No. 78 at 29.]

Mr. Skiles does not respond to Officer Rebollar's argument. [Filing No. 76.]

34 U.S.C. § 12601 is a part the Violent Crime Control and Law Enforcement Act of 1994, which "created a pathway for the DOJ to institutionally address unconstitutional police behavior." Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796, § 210401. The statute authorizes the United States Attorney General to bring an action, not a private citizen. Accordingly, the statute does not apply here.

In any event, Mr. Skiles makes no argument regarding this claim. His failure results in the waiver of any argument under the statute. *See Draper*, 664 F.3d at 1114; *Schaefer,* 839 F.3d at 607.

Officer Rebollar's Motion for Summary Judgment is **GRANTED** as to Mr. Skiles' claim under 34 U.S.C. § 12601.

### C.  State Law Claims

Having dismissed all of Mr. Skiles' federal claims, the Court must determine whether it will exercise supplemental jurisdiction over the remaining state law claims. The Court ultimately has discretion whether to exercise supplemental jurisdiction over a plaintiff's state law claims. *Carlsbad Tech, Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see also* 28 U.S.C. § 1367(c) ("the district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction"). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

The Seventh Circuit has made it clear that "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce*

*v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *see also Sharp Electronics Corp. v. Metropolitan Life Ins. Co.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (citation and quotations omitted).  Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (quoting *Wright v. Associates Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994) (internal quotations omitted)).

As explained below, this case fits squarely within the third exception because "it is absolutely clear how the pendent claims can be decided." *Davis*, 534 F.3d at 654.  The Court therefore exercises supplemental jurisdiction over the remaining state law claims.

Mr. Skiles' Complaint cites two subsections of Indiana Code § 34-13-3-3, a statute that provides immunity from tort claims for government entities and their employees acting within the scope of employment.  The Court surmises that Mr. Skiles is alleging that Officer Rebollar is liable under Indian's tort law and that the statutory grant of immunity in Indiana Code § 34-13-3-3 does not apply.[18]  However, the Court notes that Mr. Skiles did not allege which state tort law Officer Rebollar violated, leaving the Court with nothing to analyze.  Therefore, Mr. Skiles' claim fails as a matter of law.

---

[18] In any event, if Mr. Skiles were alleging something else, it is waived for failure to develop it. *See Draper*, 664 F.3d at 1114; *Schaefer,* 839 F.3d at 607.

Yet even assuming that Officer Rebollar violated a state tort law, Mr. Skiles' state law claim would fail because he did not file the requisite notice. The Indiana Tort Claims Act applies to any "claim or suit in tort," Ind. Code § 34-13-3-1(a), and operates to bar such claims or suit unless a tort claims notice is served upon the governing body within 180 days after the loss occurs, Ind. Code § 34-13-3-8(a); *see also Townsend v. Wilson*, 652 F. App'x 449, 454 (7th Cir. 2016) ("The Indiana Tort Claims Act requires that notice under that statute be given within 180 days of a loss attributable to a municipality or the municipality's employees acting within the scope of their employment."). There is no evidence that Mr. Skiles filed the required notice, and in his Objection to Motion for Summary Judgment, Mr. Skiles admitted that he was "unaware that [he] was required to file a tort claim." [Filing No. 76 at 3.]

Officer Rebollar's Motion for Summary Judgment is **GRANTED** as to Mr. Skiles' state law claims.

## V.
### CONCLUSION

The Court is sympathetic to the difficult circumstances Mr. Skiles has faced, which likely contributed to his behavior on June 28, 2020. But Mr. Skiles has not presented evidence from which a reasonable jury could conclude that Officer Rebollar's actions were unlawful. Accordingly, based on the foregoing, the Court **GRANTS** Officer Rebollar's Motion for Summary Judgment, [58]. Final judgment shall enter accordingly.

Date: 11/21/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF to all counsel of record.**

**Distribution via United States Mail to:**

Roy Elijah Skiles
17381 Cayuga Dr., Apt E
Westfield, IN 46074